# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

JEFFREY EVANS and CLARISSA WEISS on behalf of themselves and all others similarly situated,

Plaintiff,

vs.

MACMILLAN, SIMON & SCHUSTER, HACHETTE BOOK GROUP, HARPERCOLLINS PUBLISHERS, PENGUIN GROUP (USA), INC., RANDOM HOUSE, INC. and APPLE, INC.

Defendants.

Case No. CIV 5609

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiffs Jeffrey Evans and Clarissa Weiss ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against the above-captioned Defendants, based on counsel's investigation, research, and review of publicly available documents, on Plaintiffs' personal knowledge, and upon information and belief:

## NATURE OF THE CASE

1.     This case challenges a horizontal conspiracy among the Publisher Defendants (defined *infra*) who, together with co-conspirator defendant Apple, Inc. ("Apple"), entered into contracts and agreements to restrain trade in the consumer retail market for electronic books ("eBooks").

2.     The horizontal portion of the conspiracy constitutes *per se* illegal conduct in that the Publisher Defendants and Apple agreed to raise, fix, stabilize and maintain the retail, consumer prices of the eBook versions of hardcover best sellers and new releases at an artificially high level.  They did this by fixing the consumer retail prices of these eBooks at levels above the $9.99 retail price ceiling that

prevailed immediately prior to implementation of the illegal agreement. The illegal agreement encompassed pricing the majority of hardcover best sellers and new releases within a minimum price band of $12.99 to $14.99 – an increase of $3.00 to $5.00

3.    This case also challenges vertical restraints of trade that are an integral part of the horizontal conspiracy. The Publisher Defendants and Apple agreed that each of the Publisher Defendants would impose upon eBook retailers a new, so-called "agency" distribution method that prohibits online retailers from deviating from the retail prices dictated by the publishers.

4.    Under the agency model of distribution, the Publisher Defendants set the price at which eBooks are sold, and retailers are limited to acting as agents selling at the set price and collecting a commission for doing so. The agency model represents a dramatic departure from the wholesale distribution model that has governed the retail sale of printed books for decades and had governed the retail sale of eBooks since their inception.

5.    The conspiracy began after online eBook retailer Amazon.com ("Amazon") implemented a competitive retail pricing policy of charging consumers no more than $9.99 for any eBook. Amazon had ignited the development of eBook distribution with the 2007 introduction of its "Kindle" eBook reader, and its $9.99 pricing policy (in effect throughout 2009 and early 2010) was followed by other eBook retailers. Amazon was able to implement this price because the Publisher Defendants had no control over the prices Amazon and other online retailers charged their customers.

6.    The Publisher Defendants believed Amazon's $9.99 pricing policy would lead to lower wholesale prices for eBooks, and they were accordingly highly motivated to implement a means of controlling retail prices for eBooks. However, as one published report states, "none of the publishers seemed to think that they could act alone, and if they presented a unified demand to Amazon they risked being charged with price-fixing and collusion."

7.     Defendant Apple's introduction of its iPad tablet computing device in 2010 provided an opportunity for the Publisher Defendants to collude and reverse the downward slide in eBook retail pricing.

8.     Publisher Defendants negotiated and agreed among themselves and through Apple as intermediary to (1) to raise, fix, stabilize and maintain the retail price of eBook versions of hardcover and new release titles above the then-prevailing $9.99 price, and to fix and maintain most of those prices in the range of $12.99 to $14.99, and (2) to effectuate that horizontal agreement through an "agency" distribution model prohibiting deviation by retailers from the retail prices dictated by the publishers, thereby enforcing the horizontal agreement.

9.     Apple and the Publisher Defendants also collectively agreed to impose the same "agency" model on all of the other eBook retailers, and to grant Apple "most favored nation" pricing status.  This meant that the retail price set by Publisher Defendants for Apple would not be higher than the retail price the Publisher Defendants set for other eBook retailers.  This effectively ended price competition for the retail sale of eBooks, and supported the maintenance and enforcement of the horizontal price fixing conspiracy.

10.     Five of the six Publisher Defendants and Apple implemented the foregoing horizontal and vertical price-fixing agreements and restraints of trade simultaneously in April 2010, contemporaneously with the commercial introduction of the Apple iPad.

11.     These five Publisher Defendants immediately set the retail prices for bestseller and new release titles above the $9.99 level. Most were set in the range of $12.99 to $14.99, $3.00 to $5.00 per eBook higher than the $9.99 price that prevailed immediately prior to the simultaneous implementation of the new agency and pricing agreements.

12.     Random House evidenced its agreement and joinder in the horizontal conspiracy by announcing in February 2011 that it would implement identical agency agreements and retail pricing for its eBook editions.  Random House implemented its compliance with the horizontal agreement effective March 1, 2011, and immediately set its retail prices for best sellers and new releases  above the $9.99 level at which they had been priced prior to March 1, 2011.  Most of the Random House prices rose to the $12.99 to $14.99 level. That Random House agreed to join the pre-existing conspiracy is evidenced by the fact that Random House implemented the identical agency pricing model and identical prices for its best seller and new release titles as the other co-conspirators had done earlier.

13.     The illegal agreement has had the predictable adverse impact on competition and prices in the retail market for eBooks.  Since the implementation of the horizontal and vertical conspiracies the only eBook versions of best seller and new release titles priced as high as $12.99 and above on the websites of the major on-line book sellers, such as Amazon, Barnes & Noble, Google and Sony, have been those of the Publisher Defendants.    In stark contrast, new release and bestseller eBooks published by publishers other than the Publisher Defendants are typically priced on the major book sellers' websites at no higher than $9.99.

14.     Moreover, there is no longer any competitive pricing among the eBook on-line sellers with respect to titles of the Publisher Defendants.  Amazon's Kindle eBook store dramatically announced publicly that the Publisher Defendants have eliminated its ability to price eBooks competitively by displaying the following disclaimer as to each such eBook: "This price was set by the publisher."  As a result of the Defendants' collective, horizontal agreement to impose the agency pricing scheme, the retail price for each individual eBook title published by each Publisher Defendant has been fixed and maintained at exactly the same price across all eBook sellers.

15.     The following factors plausibly suggest the sudden and sustained jump in the retail prices of eBooks published by the Publisher Defendants is the result of an illegal price fixing agreement and a horizontal agreement to prevent competitive pricing:

a.     The declining price in consumer eBooks threatened the Publisher Defendants, as they believed it would lead to a decline in eBook wholesale pricing.

b.     The replacement of the traditional wholesale/retail distribution model with an unprecedented new "agency" model was done nearly simultaneously by five of the six Publisher Defendants, as was the increase in the retail prices to the identical, higher price range of $12.99 to $14.99.  These changes are not likely to have occurred without prior discussion, agreement and coordination.

c.     It would not have been in the independent self-interest of any single Publisher Defendant to implement a price increase without knowledge that most of the other Publisher Defendants would do the same.  Such a lone actor would be subject to negative publicity from consumers and retailers alike, and would see his eBook market share decline in favor of the lower prices of others.  Indeed, when Defendant Macmillan first tried to impose the agency model and pricing upon retailer Amazon, Amazon immediately removed all Macmillan's eBook titles from its store.  Amazon's removal lasted for only a weekend, until it realized most other major trade book publishers were imposing the same agency model.

d.     The Publisher Defendants needed a means of facilitating the implementation, monitoring, and enforcement of the horizontal agreement to raise and fix retail prices, and the agency model fit this goal by taking price discretion away from the retailers

and placing retail price setting decisions firmly under the control of the Publisher
Defendants.

e.  Public reports indicate Apple reached agreement on the agency model and retail price
levels with five of the six Publisher Defendants before the public debut of the iPad on
April 1, 2010.  Collusion provides a far more plausible explanation for the Publisher
Defendants' price increases than the alternate scenario: one publisher adopting the
agency model and raising its price, and being followed later by others, without any
prior assurances that the others would follow.

f.   Two months before the agency model was imposed, Apple publicly stated that the
price of eBooks would be the same among the various retailers once the agency
model was implemented.  This plausibly evidences that Apple acted as an
intermediary, sending a signal to assure each of the Publisher Defendants that each of
the others would agree to the agency model and most favored nation treatment.

g.  There has been no increase in the cost of publishing or distributing eBooks, and, if
anything, the average cost of doing so has been steadily declining as sales of eBooks
have dramatically increased and technologies have improved.

h.  Under the agency model, the Defendant Publishers' profit margins are generally
larger for eBook sales than they are for the same book titles sold as hardcover
editions.  Thus, in the absence of a horizontal agreement, each publisher would have
an individual economic incentive to reduce its retail eBook prices to increase its
market share while still maintaining profit margins at least as high those realized on
hardcover sales.

i.   The trade publishing industry is highly susceptible to a horizontal conspiracy.  Six major trade publishers dominate the trade book industry.   The major publishers belong to the same industry organizations and meet with each other regularly to exchange information and to discuss topics of common interest, including copyright issues, piracy issues, author contracts and royalties, and, it can be inferred, also pricing issues.  The retail pricing of eBooks is very easy to detect and police, as all eBook retail prices are shown every day on the on-line stores of the retailers.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, and the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiffs and the Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also bring this action pursuant to the Donnelly Act, N.Y. Gen. Bus. Law §340, N.Y. General Business Law § 349, and Michigan Comp. Laws Ann. §§ 445.771 *et seq.*, all as alleged in this Complaint.

17.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and pursuant to the principles of pendent jurisdiction.

18.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).  Venue is proper in this District because one or more of the Defendants resides, transacts business, is found, or has agents in this District, because a part of the events giving rise to Plaintiffs' claims occurred in this District, and a portion of the affected interstate trade and commerce described below was carried out in this District.

19.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) has transacted business throughout the United States, including in this District, and continues to do so; (b) has delivered or sold substantial quantities of eBooks and other products throughout the United States, including in this District, and continues to do so; (c) had and has substantial contacts with the United States, including in this District; and (d) was and is engaged in antitrust conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

20.     Plaintiff Jeffrey Evans is an individual residing in the State of Michigan, County of Kent. Plaintiff purchased eBooks published by a Publisher Defendant and subject to agency pricing at a price higher than $9.99.   Plaintiff has been injured because he paid an artificially high and anticompetitive price as a result of the unlawful conduct alleged herein affecting the price of the purchased eBooks.

21.     Plaintiff Clarissa Weiss is an individual residing in the State of New York, Queens County. Plaintiff purchased eBooks published by Publisher Defendant and subject to agency pricing at a price higher than $9.99. Plaintiff has been injured because she paid an artificially high and anticompetitive price as a result of unlawful conduct alleged herein affecting the price of the purchased eBooks.

22.     Defendant Macmillan is a subsidiary of Verlagsgruppe Georg von Holtzbrinck, GMbH, based in Germany.  Its principal U.S. office is located in New York, N.Y.  Macmillan does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBooks in this District.

23.     Defendant Simon & Schuster is a subsidiary of CBS Corporation.  Its principal U.S. office is located in New York, N.Y.  Simon & Schuster does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBooks in this District.

24.     Defendant Hachette Book Group ("Hachette") is the United States subsidiary of France-based Hachette Livre.  Hachette Book Group's principal U.S. office is located in New York, N.Y. Hachette Book Group does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBooks in this District.

25.     Defendant HarperCollins Publishers ("HarperCollins") is a subsidiary of News Corporation.  Its principal U.S. office is located in New York, N.Y.  HarperCollins does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBooks in this District.

26.     Defendant Penguin Group (USA) Inc. ("Penguin") is the United States subsidiary of England's Pearson PLC.  Penguin's principal U.S. office is located in New York, N.Y.  Penguin does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBooks in this District.

27.     Defendant Random House, Inc. ("Random House") is the United States division of Random House, the world's largest trade-book publisher, and is owned by Bertelsmann AG.  Its principal place of business is in New York, New York.

28.     The foregoing Defendants, Macmillan, Simon & Schuster, Hachette Book Group, HarperCollins Publishers, Random House, and Penguin Group (USA), Inc. are referred to collectively herein as "Publisher Defendants."

29.     Defendant Apple is incorporated is the State of California, with principal offices in Cupertino, California.  Apple does business throughout the United States and within this District,

including the sale or delivery of substantial quantities of eBook readers and eBooks in this District. All defendants, including Apple, are collectively referred to as "Defendants."

## DEFINITIONS

30.   <u>eBook</u>: An eBook is an electronic equivalent of a printed book in digital form that can be read on a computer or digital reading device

31.   <u>eReader</u>: An eReader is a digital hardware device that can download, store and display eBooks on a screen where they can be read. Some eReaders are dedicated, stand-alone reading devices specifically designed for reading eBooks and optimized for display size and lighting, weight, and battery life characteristics to closely simulate the reading of a printed book. The most popular current models of dedicated eReaders include the Amazon Kindle, the Barnes & Noble Nook, the Kobo, sold at Borders, and the Sony PRS-500. eBooks can also be read on multi-function devices such as desktop and laptop computers and digital phones. In April 2010, Apple began selling the multi-function iPad that includes an eBook reader application called iBooks.

32.   <u>Trade Publisher</u>: A trade publisher is a publisher specializing in books for general consumption for sale through retail bookstores. As of March 2008, Michael Hyatt, CEO, Thomas Nelson Publishers, listed the top five trade publishers by sales revenue as Random House, Pearson (Penguin Books), Harper Collins, Simon & Shuster, and Hachette.

33.   <u>Trade eBook</u>: A Trade eBook is an eBook version of a trade book published for general consumption and for online sale through retail eBookstores such as Amazon, Barnes & Noble, or Google's eBookstores, or the Apple iPad bookstore.

34.   <u>Best Sellers and New Releases</u>: Best Seller and New Release titles are those listed as such on the online stores of the eBook retailers, and generally constitute recently released books that are still in hardcover edition.

## RELEVANT MARKET ALLEGATIONS

35.      This Complaint alleges per se violations of the antitrust laws that require no market definition.

36.      In the alternative, trade eBooks constitute a relevant market.

37.      eBooks can be read only on electronic devices such as dedicated eReaders and multifunction electronic devices, and printed books are not a substitute for consumers who have purchased eReaders or multifunction electronic devices and who wish to download books to read using those devices.  In addition to being the product preferred by owners of eReaders, eBooks have a number of unique and advantageous characteristics that distinguish them as separate products from their printed book cousins.

38.      Principal among these distinguishing features is their enormous advantage in convenience.  eBooks take up virtually no space and do not require libraries, rooms or shelves to store them. Hundreds of eBooks can be stored and transported on a portable eReader that takes up little space in a handbag, briefcase or luggage, without worry as to their weight or bulk. Consumers can switch their reading among several books on the fly while carrying only a single eReader or multifunction electronic device, which is generally smaller and lighter than even a single printed book.  New eBooks can be downloaded instantly to the eReader or multifunction electronic device wherever an internet connection (including wi-fi) is available at any time of the day or night anywhere in the world.  There is no need to locate and travel to a bookstore or wait for the books to arrive in the mail.

39.      Other differences include that eBooks are electronically searchable, can contain links to other information, have functions to highlight and retrieve key passages or phrases, and provide instant dictionary definitions.  Finally, eBook type fonts can be resized to accommodate the differing visual demands of the reader or the available lighting.

40.     Customers for eBooks are unlikely to switch to printed books in response to a small but significant increase in eBook prices.  The many distinctions between eBooks and printed books is reflected in publicly available data indicating rapid growth in the sales of eReaders and eBooks, far outstripping the growth rates of printed books, indicating a paradigm product shift to eBooks by consumers.  This data indicates that people who buy eBook readers buy mostly eBooks in preference to printed books.  Also, eBooks are generally less expensive than printed books, even following the anticompetitive horizontal agreement on prices alleged in this Complaint, indicating they are in separate product markets.  Many recent titles have been published only as eBooks.

41.     Trade eBooks are electronic versions of printed trade books traditionally sold for general consumption in retail bookstores in hardback and paperback versions.  Trade eBooks are a relevant market in the electronic, online marketplace in the same way that trade books constitute a relevant market in the retail bookstore printed book marketplace.

42.     The relevant market for production of trade eBooks is highly concentrated, including the six major trade publishers, who are the Publisher Defendants.  Barriers to market entry, including reputation barriers and exclusive contracts with popular authors, are substantial.  The structure of the market allows the Publisher Defendants to exercise market power and coordinate unlawfully to profitably raise price.

43.     Trade eBook New Releases and Best Seller titles are also a relevant market.  These titles are differentiated by publishers in that they are circulated in hardback editions for a period generally of six months or more from date of publication before they are converted to paperback format and their list prices are maintained in the highest priced trade book categories by the publishers during the same time period. These titles are also differentiated by retailers in that they are placed on specially marked New Release and Best Seller shelves and tables in hardback format at the brick and mortar stores and in

special, customer searchable New Release and Best Seller categories in online bookstores for both the hardcover and the eBook versions.  Consumers also perceive the New Releases and Best Sellers to be a relevant market, as they are willing to pay higher prices for these books in order to read the latest titles by their favorite authors and the most recommended and timely, new non-fiction books.  Older books are not an adequate substitute for consumers who want to read the latest releases, and consumers are not likely to cease buying new releases in significant amounts when retail prices rise.

44.     The relevant geographic market for the purposes of this Complaint is the United States.

## INTERSTATE TRADE AND COMMERCE

45.     The activities of Defendants, as described in this Complaint, were within the flow of and substantially affected interstate commerce.  During the Class Period, Defendants produced, delivered, and sold substantial quantities of eBooks and other products in a continuous and uninterrupted flow of interstate commerce, including through and into this District.  The anti-competitive conduct in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### History of the eBooks market.

46.     An eBook provides the content of a printed book in digital form that can be read on a computer or digital reading device.

47.     The early development of eBooks was characterized by a fragmented market largely limited to technical publications with a number of mutually incompatible formats and readers.

48.     A public, mass market for Trade eBooks of popular new releases and best sellers did not emerge until 2007 when Amazon introduced the first version of its dedicated eBook reader, called

Kindle, and began selling popular, trade book titles as eBooks that could be downloaded on-line and read on a Kindle reader.

49.     Following the introduction of the Kindle, the sales of eBooks have risen dramatically.   In July 2010, Amazon announced that, for the first time ever, sales of eBooks exceeded sales of hardcover books by a margin of 143 to 100.  According to the Association of American Publishers, sales of eBooks for 2010 were up 164.4% compared to 2009 ($441.3 million in 2010, as compared to $166.9 million in 2009).

50.     Until April 1, 2010, eBook retailer Amazon.com maintained a retail pricing policy where no Best Seller or new release eBook would be priced higher than $9.99 for the eBook version.

51.     Amazon's $9.99 price for eBook Best Sellers and New Releases became a price benchmark followed by other eBook retailers. The price was substantially below even the in-store discounted prices of the hardcover editions of the same titles.  Price competition at the online retail level not only benefitted consumers with lower prices for eBooks, but also led to increased output in terms of rising sales of both eBooks and eReaders.

52.     The substantially lower price of eBooks, as compared to the printed versions, was no surprise: the production and distribution of eBooks is cheaper than that of traditional books, and in a competitive market, cost reductions such as those associated with eBooks lead directly to consumer price reductions.

53.     Although Amazon's Kindle was the first dedicated eReader with mass-market consumer appeal, the aggressive and competitive pricing of the eBook content led to an increase in consumer demand for eBooks. That led in turn to technological improvements and increased competition in dedicated eReaders and multifunction electronic devices used for reading eBooks, characterized by a

proliferation of new devices and new generations of devices and by steadily falling consumer prices,

particularly for dedicated eReaders.

## The Agency Model

54.     Amazon was able to set competitive, consumer-friendly, retail prices for eBooks because,

until the Spring of 2010, eBooks were distributed pursuant to the traditional "retail" model – i.e. the

same distribution model utilized for the sale of printed books.  Such books traditionally have been sold

by publishers, acting as wholesalers, to bookstores, acting as retailers.  Under this retail model, the

retailers have full discretion to set the final retail price of the books in sales to consumers.

55.     The pricing freedom afforded eBook retailers by the traditional retail model led to

competition between retailers, which in turn led to lower prices for consumers.  Amazon's $9.99 pricing

policy clearly demonstrated this pricing competition.

56.     The Publisher Defendants feared that consumer expectations that eBooks should be

priced at $9.99 would lead Amazon and other retailers to demand a lower wholesale price for eBooks,

which would in turn lead to lower profits for all publishers.

57.     Thus, public reports indicate that in January 2010, the Publisher Defendants had been

talking for "months . . . about imposing an 'agency model' for eBooks," that would reverse this

downward pricing trend.  However, "none of the publishers seemed to think that they could act alone,

and if they presented a unified demand to Amazon they risked being charged with price-fixing and

collusion."

58.     The "agency model" of eBook pricing controls price by designating retailers as the

Publisher Defendants' "agents," meaning the Publisher Defendants dictate the price at which retailers

will sell eBooks.

59.     Under the agency model, the retailers must offer the book to customers at the publisher's price.  Price competition between retailers is impossible.  Instead, retailers merely collect a fee or commission for arranging the sale of an eBook to a consumer at a price fixed by the Publisher Defendant.

**The agent/retailers are companies that the end user traditionally perceives as retailers, such as Amazon, Barnes & Noble, or Borders.**

60.     The Introduction of the iPad Provides Opportunity for Price Collaboration Between the Publisher Defendants

61.     In January 2010, Apple announced it would be introducing in April 2010 a tablet computer device known as the iPad.  Among other things, the iPad could function as an eBook reader.

62.     Apple indicated it planned to sell iPad-compatible eBooks through its so-called "iBookstore" online store, which would open contemporaneously with the introduction of the iPad.

63.     Prior to the announcement, Apple had been planning and negotiating the terms of eBook sales with the Publisher Defendants.  These negotiations created an opportunity for the Publisher Defendants to collaborate and reverse the downward slide in consumer pricing of eBooks.

64.     Apple, in turn, was motivated to prevent price competition at the retail level to ensure the sale price of eBooks would remain high and free from competition.  Amazon's $9.99 pricing policy threatened this goal.  Indeed, around this time, an Apple insider reportedly said of Apple CEO Steve Jobs that "[h]e thinks Amazon is stupid, and made a terrible mistake insisting that books should be priced at $9.99."

65.     Accordingly, Apple collaborated with the Publisher Defendants concerning use of the "agency" model, which would allow the Publisher Defendants to raise and stabilize the consumer price of eBooks at an agreed-to price.

66.     These discussions took place in the months before the debut of the iPad. Apple negotiated, individually and collectively, with each Publisher Defendant concerning the terms of the agency model.

67.     The discussions included pricing negotiations, with publishers wanting the top price set at seventeen dollars and Apple insisting on fifteen.

68.     Ultimately, contemporaneously with their discussions with Apple (and by and through Apple), five of the six Publisher Defendants agreed in April 2010 to (1) set consumer retail prices of $12.99 or more for eBook versions of most  new releases and best sellers and to raise the retail prices of others above the $9.99 price prevailing at the time, and (2) implement this charge through the coordinated introduction of the agency model.  Random House joined the conspiracy and implemented the Agency Agreement in March 2011.  It was the sole "big six" publisher that did not implement the agreement contemporaneously with the others in April 2010.

69.     A central component of the Publisher Defendants' agreements with Apple is a so-called "most favored nation" clause, under which the Publisher Defendants agree that no other retailer/agent will be permitted to sell any eBooks for less than the prices offered in the iBookstore.

70.     These clauses, coupled with the agency model, ensure that there will be no price competition at the retail level for eBooks sold pursuant to the agency model.

**The April 2010 Price Increase Was the Product of Collaboration**

71.     The Publisher Defendants' decision to raise prices through the introduction of the agency model in April 2010 was the product of collaboration.

72.     On January 27, 2010, Apple CEO Steve Jobs, when indicating that five of the six Publisher Defendants had agreed to sell their eBooks through the iBookstore using the agency model,

was asked why customers would "pay Apple $14.99 when they can buy the same book from Amazon for $9.99." Jobs responded "That won't be the case . . . . The price will be the same."

73.     Jobs was able to make this statement because he knew, as a result of his discussions with each Publisher Defendant, that each Publisher Defendant would impose identical pricing for new release and hardcover eBooks. Apple's prior knowledge and public announcement that eBook prices through other retailers would be uniform was a signal to the Publisher Defendants that each of them had agreed to join the conspiracy.  This indicates prior agreement among Apple and the Publisher Defendants to prevent price competition at the retail level.

74.     On January 28, 2010 – the very next day – Macmillan CEO John Sargent met with Russ Grandinetti, vice-president of Kindle Content, and threatened to withhold Amazon's access to Macmillan's eBooks if Amazon did not agree to market those eBooks using the agency model.  This action would have been irrational if Macmillan had not expected its primary competitors to follow suit.

**Amazon immediately stopped selling Macmillan's eBooks.**

75.     Amazon then learned that other Publisher Defendants planned to make a similar demand of Amazon.  Faced with this collective demand for imposition of the agency model (and faced with the prospect of denial of access to the majority of Best Sellers) Amazon capitulated to Macmillan's demand.

76.     Amazon announced this capitulation by posting the following announcement on its web site: "We will have to capitulate and accept Macmillan's terms because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books."

77.     Shortly afterwards, the CEO of Macmillan, in a blog post published March, 2, 2010, publicly announced that "[s]tarting at the end of March, we will move from the 'retail model' of selling eBooks (publishers sell to retailers, who then sell to readers at a price that the retailer determines) to the

'agency model' (publishers set the price, and retailers take a commission on the sale to readers). We will make this change with all our eBook retailers simultaneously. . . . Generally eBook editions of hardcover new releases will be priced between $14.99 and $12.99; a few books will be priced higher and lower."

78.    A March 31, 2010 press release by Hachette announced that starting "on April 1, 2010, all eBook titles published by Hachette Book Group will be sold directly to consumers by means of third party agents."

79.    On April 1, 2010, the Wall Street Journal reported that Simon & Schuster and HarperCollins had both agreed to enter into an agency model pricing policy with Amazon.

80.    On that same date, Penguin refused to allow Amazon to continue to sell its newly released eBooks due to Amazon's refusal to enter into an agency model agreement with Penguin. Amazon was cut off from all of Penguin's new eBook releases until approximately May 26, 2010, when the Wall Street Journal reported Amazon had capitulated and agreed to the agency pricing model with Penguin.

81.    Barnes & Noble also reportedly confirmed during the week of April 1 that it was "moving to the agency model with publishers including Hachette, HarperCollins, Macmillan, Penguin, [and] Simon & Schuster."

82.    By the time of the retail introduction of the iPad – April 3, 2010 – each of the Publisher Defendants except for Random House had carried out its part of the horizontal agreement and either implemented the agency model with its retailers or began refusing to deal with those retailers.  Indeed, these Publisher Defendants implemented the agency model on approximately the same day: April 1, 2010.

83.     News reports indicate that the agreements between each of the Defendant Publishers and Amazon generally set the price for hardcover and new releases within a price range of $12.99 – $14.99, a dramatic increase over the then-prevailing $9.99 price point. eBook prices stated on the websites of Amazon, Barnes & Noble and other online, eBook sellers in the period since April 2010 confirm this new, higher price range.

84.     Imposition of the agency model by each Publisher Defendant ended retailer discretion over prices, thereby stabilizing the price of eBooks at an artificially high level.

85.     The most plausible explanation for the April 2010 simultaneous coercive imposition of an unprecedented marketing and pricing change on retailers with regard to eBooks is an agreement among the Defendants.  This is particularly true given that the agency agreements had the effect of simultaneously raising the retail price of eBooks to a stable and uniform level across the Publisher Defendants.

86.     Indeed, it would be against the economic interests of each Publisher Defendant to enter into agency agreements involving artificially higher prices without assurance that competitors were doing the same.  Acting alone, no individual Publisher Defendant would be able to sustain the supra-competitive prices for eBooks now prevailing in the eBooks market.  Accordingly, the five Publisher Defendants implementing the agreement in April 2010 would not have done so absent assurances others were doing the same.

87.     The agency model had a direct and immediate effect on the price of eBooks. Immediately following the April 2010 implementation of the Agency Agreement, most best seller and new release eBooks written by leading authors and published by the initial five Publisher Defendants implementing the agreement jumped in price from $9.99, and most jumped to the range of $12.99 to $14.99.

88.     Prices for other eBooks did not follow suit.  For example, on January 3, 2011, the new book Decision Points by former president George W. Bush (published by Crown Publishing Group, a division of Random House) appeared on the New York Times bestseller list.  The eBook version of this book initially sold on-line for $9.99.  That price continued until Random House joined the conspiracy as of March 1, 2011, at which time Random House priced Decision Points at $14.99 and then later raised it to $16.99, a total price increase of $7.00, or 70%.

**Random House Subsequently Agrees to the Fixed Price**

89.     Random House participated in the negotiations prior to the introduction of the iPad, but did not agree to the fixed price and agency agreement at that time.  Instead, Random House issued a statement indicating it intended to continue its discussions with Apple.

90.     Throughout 2010, Random House accordingly continued to sell its eBooks pursuant to the traditional retail method, and its eBooks were priced lower as a result.  Amazon, for example, sold them at the prior $9.99 rate.

91.     Apple, in contrast, did not sell Random House's books at all, as Apple refused to deal with any publisher who did not assent to the agency model.  This refusal to deal with Random House provides further evidence that Apple was a part of a conspiracy with the other Publisher Defendants and was doing its part to pressure Random House to join the conspiracy.

92.     On February 28, 2011, following additional discussions with Apple, Random House publicly signaled its joinder in the horizontal price fixing conspiracy when it announced that it would implement the agency model on March 1, 2011.

93.     Simultaneously with that implementation, Random House set the retail prices of its new release and best seller eBook editions above the $9.99 price point.  Most of these prices rose to between $12.99 and $14.99.

94.     For example, Decision Points by George W. Bush, published by Random House – which, as noted above, sold for $9.99 on Amazon on January 3, 2011 – sold for $14.99 through Amazon on April 6, 2011, after Random House implemented the agency model.  Random House has now raised that price to $16.99.

### The Agency Model Has Led to Artificially High and Stable Prices

95.     The agency model agreements between the Publisher Defendants and their retailers has removed all discretion from retail pricing, and has led to an increase to an artificially high price for  the majority of eBook best sellers and new releases.

96.     Similarly, the most favored nation's agreements between the Publisher Defendants and Apple mean that no retailer can deviate from the price dictated by a Publisher Defendant.

97.     This stands in stark contrast to digital music pricing.  Digital music pricing is set by retailers (including Apple) and is different depending on the retailers' site.

98.     As a result of the illegal agreement and horizontal conspiracy the retail prices of most, if not all of the Publisher Defendants' eBook versions of hardcover bestsellers and new releases have been fixed in the range of $12.99 to $14.99 and generally they are the only eBooks with retail prices above $9.99.

### Multiple Regulatory Agencies are Investigating the Agency Model

99.     The attorneys general of both Connecticut and Texas have opened investigations into the pricing practices among the Publisher Defendants and Apple and Amazon. The Connecticut Attorney General issued a statement about its investigation, explaining "agreements among publishers, Amazon and Apple appear to have already resulted in uniform prices for many of the most popular eBooks."

100.    Media reports indicate that the United States Department of Justice is also investigating Amazon and Apple's deals in the eBook publishing industry, although the Department of Justice has not confirmed the reports.

### Under the Agency Model, the Retailers Serve Solely as Agents

101.    As described above, the agency model is a scheme that deprives retailers of any discretion to set the price of eBooks and requires retailers to act solely as an agent between the Publisher Defendants and Class Members.

102.    The Retailers' services as agent are limited to posting the eBooks on their web site and responding to orders with downloads.  These are the activities of an agent, not a retailer, and do not add significant value to eBooks.

103.    The agency agreements fix the price at which retailers sell eBooks to consumers. Accordingly, Class Members purchase eBooks directly from the level in the distribution chain at which the price of eBooks is fixed.

104.    The retailers – both named and unnamed – are, by virtue of the agency agreements, co-conspirators with the Publisher Defendants.

105.    Accordingly, for purposes of the antitrust claims brought by this Complaint, Plaintiffs and Class Members purchased eBooks directly from the Publisher Defendants.

106.    In the alternative (i.e. if this Court determines Plaintiffs and the Class indirectly purchased eBooks), Plaintiffs and Class Members' purchases of eBooks give them standing to pursue injunctive relief under the federal antitrust laws and damages claims under the state antitrust laws in this Complaint.

### ANTITRUST INJURY

107.    The unlawful actions alleged herein have had and are having, inter alia, the following effects:

108.    Prices charged by Defendants and their co-conspirators to Plaintiffs and members of the Class for eBooks are maintained at artificially high and supra-competitive levels.

109.    Plaintiffs and members of the Class were required to pay more for eBooks than they would have paid in a competitive market unfettered by Defendants collusive and unlawful conduct.

110.    Plaintiffs and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for eBooks.

111.    During the Class Period, Plaintiffs and the Class purchased eBooks directly in the United States from one or more of the Publisher Defendants' agents.

112.    Plaintiffs and the Class paid more for eBooks than they would have paid under conditions of free and open competition.

113.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiffs and members of the Class were injured and financially damaged in their business and property, in amounts that are not presently determined.

114.    The harm to Plaintiffs and other consumers of eBooks because of the artificially high pricing of eBooks amounts to many millions of dollars.

115.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ALLEGATIONS

116.    This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4), 23(b)(3).

117.    Plaintiffs brings this action as a class action on behalf of themselves and all others similarly situated as a member of a Class ("National Class"), initially defined as follows:

118.    All persons who purchased eBooks of Publisher Defendants through Apple, Amazon, or other eBook retailers subject to the Publisher Defendants' agency model pricing scheme and priced above $9.99, excluding Defendants, any entity in which Defendants have a controlling interest, any of the officers, directors, or employees of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any judge to whom this case is assigned and his or her immediate family.

119.    This case is also brought on behalf of the following class ("Michigan Class"): All residents of the State of Michigan who purchased eBooks of Publisher Defendants through retailer Defendant Apple, Amazon, or other eBook retailers subject to the Publisher Defendants' agency model pricing scheme and priced at $9.99 or above, excluding Defendants, any entity in which Defendants have a controlling interest, any of the officers, directors, or employees of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any judge to whom this case is assigned and his or her immediate family.

120.    This case is also brought on behalf of the following class ("New York Class"): All residents of the State of New York who purchased eBooks of Publisher Defendants through retailer Defendant Apple, Amazon or other eBook retailers subject to the Publisher Defendants' agency model pricing scheme and priced at $9.99 or above, excluding Defendants, any entity in which Defendants have controlling interest, any of the officers, directors, or employees of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any judge to whom this case assigned and his or her immediate family.

121.    **Numerosity—Fed. R. Civ. P. 23(a)(1):** The members of the Classes are so numerous and widely dispersed that joinder of them in one action is impractical.  On information and belief, thousands of Class Members have purchased eBooks at artificially high prices.

122.     **Existence and Predominance of Common Questions of Law and Fact —Fed. R. Civ. P. 23(a)(2); 23(b)(3):** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

123.     whether Defendants engaged in anti-competitive collusive conduct involving a horizontal agreement providing for use of the agency  model for marketing eBooks, including agreement that each Publisher Defendant would enforce the model by requiring retailers to act only as agents, having the effect of artificially  fixing, raising, maintaining or stabilizing the prices of eBooks;

124.     the identity of the participants in the alleged conduct;

125.     the acts carried out by Defendants;

126.     whether Defendants violated  the antitrust laws as alleged in this Complaint;

127.     whether Plaintiffs and Class members are entitled to damages, restitution, injunctive relief and declaratory relief; and

128.     the appropriate class-wide measure of damages.

129.     **Typicality—Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of the Classes they represent as Plaintiffs who were charged artificially high prices for eBooks because of Defendants' conduct.

130.     **Adequacy of Representation—Fed. R. Civ. P. 23(a)(4):** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of Class members they seeks to represent.  Plaintiffs have retained counsel competent and experienced in class action litigation who intend to vigorously prosecute this action.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

131.    **Superiority—Fed. R. Civ. P(23)(b):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the Class members is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION: HORIZONTAL PRICE FIXING
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**
**(Against All Defendants)**
**(On behalf of the National Class)**

132.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

133.    The Publisher Defendants and Apple have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, by engaging in a horizontal agreement in restraint of trade.

134.    In furtherance of the conspiracy, each of the Publisher Defendants and Apple has committed overt acts, including, inter alia, agreeing to charge prices for consumers at agreed levels, carrying out that horizontal agreement by requiring retailers of eBooks to act only as agents and charge identical prices for particular books, and otherwise to fix, maintain, and/or stabilize prices of eBooks sold in the United States and communicating and agreeing with one another regarding the implementation of the agency model.

135.    The Publisher Defendants and Apple engaged in these activities for the purpose of effectuating unlawful agreements to fix, maintain, or stabilize prices of eBooks.

136.    Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof

and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

137.    The conduct of the Publisher Defendants and Apple constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**SECOND CAUSE OF ACTION: VERTICAL RESTRAINT OF TRADE**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**
**(Against All Defendants)**
**(On behalf of the National Class)**

138.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

139.    The Defendants have combined, conspired and entered into a horizontal agreement to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, as alleged above.

140.    In furtherance of their conspiracy, each of the Defendants has committed overt acts, including, inter alia, effectuating coercive and anticompetitive vertical arrangements with retailers requiring retailers to act only as the Publishers' agents and to adhere to retail prices for eBooks as fixed by Publisher Defendants in coordination with Apple.

141.    Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

142.    The agency agreements between the Publisher Defendants and Apple, Amazon and other retailers eliminated price competition in the retail trade eBooks market and eliminated competition among Defendants.

143.    The agency agreements and Defendants' acts and practices in furtherance thereof have no procompetitive benefits.  Even if there were any such benefits, they would not outweigh any of the anticompetitive effects described herein and, in any event, could be achieved by less restrictive means.

### THIRD CAUSE OF ACTION
**(Violation of the Donnelly Act., N.Y. Gen Bus. L. §340)**
**(On behalf of the New York Class)**

144.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

145.    Beginning at a date unknown to Plaintiffs, and continuing through the present, Defendants and their co-conspirators engaged in a contract, agreement, arrangement and combination in unreasonable restraint of business, trade, and commerce in violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340.

146.    The contract, combination, agreement and arrangement consisted of among other things, an agreement by the Defendants to secretly fix, coordinate and raise their eBook prices.

147.    This unlawful cartel had the following effects, among others:

    a.    Price competition in the sale of eBooks was suppressed and/or eliminated;

    b.    Prices for eBooks sold by Defendants and  their co-conspirators were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels;

    c.    Plaintiffs were deprived of the benefits of free and open competition, and paid artificially high, supra-competitive prices for eBooks, or purchased products that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase products that they would otherwise have purchased absent the illegal conduct.

148.    The conduct set forth above is a *per se* violation of the Donnelly Act.

149.    As a result of the conspiracy, the Plaintiffs and Class members were injured in their business and property. Plaintiffs and the Class paid higher prices for eBooks than they otherwise would have paid in a competitive market.

## FOURTH CAUSE OF ACTION
### (Violation of the N.Y. Gen. Bus. Law § 349)
### (Against All Defendants)
### (On Behalf of the New York Class)

150.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.    Defendants committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above.

152.    This Claim is instituted pursuant to Section 349 of the New York General Business Law, to obtain restitution from these Defendants for acts, as alleged herein, engaging in an act or practice that is deceptive or misleading in a material way and that Plaintiff has been injured by reason thereof

153.    Defendants' conduct as alleged herein was deceptive or misleading in a material way. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of fraudulent or deceptive business acts or practices within the meaning of Section 349 of the N.Y. General Business Law.

154.    Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.

155.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

156.    The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive and artificially inflated prices for eBooks.  Plaintiffs and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

157.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Class are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the New York General Business Law, Section 349.

## FIFTH CAUSE OF ACTION
### (Violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq*)
### (On behalf of the Michigan Class)

158.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

159.    Defendants' combinations or conspiracies had the following effects: (1) eBook price competition was restrained, suppressed, and eliminated throughout Michigan; (2) eBook prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiff and members of the Michigan Purchaser Class paid supracompetitive, artificially inflated prices for eBooks.

160.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

161.    As a direct and proximate result of Defendants' unlawful conduct, the Michigan Plaintiff and members of the Michigan Purchaser Class have been injured in their business and property and are threatened with further injury.

162.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.* Accordingly, the Michigan Plaintiff and the members of the Michigan Purchaser Class seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and the Class, respectfully prays:

A.    that this Court declare this action to be a proper class action under Fed. R. Civ. P. 23(b)(3) on behalf of the Class as defined herein, and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given each member of the class;

B.    that this Court declare the unlawful combination and conspiracy alleged herein to be an unreasonable restraint of trade of commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1;

C.    that this Court enjoin, preliminarily and permanently, Defendants from continuing the unlawful combination and conspiracy alleged herein;

D.    that this Court award Plaintiffs and each member of the Class damages, as provided by law, and that joint and several judgments in favor of Plaintiffs and each member of the Class be entered against Defendants and each of them in an amount to be trebled in accordance with the antitrust laws;

E.    that this Court award Plaintiffs and each member of the Class damages and/or restitution, as provided by law, and that joint and several judgments in favor of Plaintiffs and each member of the Class be entered against Defendants and each of them in accordance with the antitrust laws of the States of New York and Michigan, and the consumer protection laws of the State of New York;

F.      that this Court award Plaintiffs and the Class the costs of this suit (including expert fees), and reasonable attorneys fees, as provided by law; and

G.      that this Court award such other and further relief as the nature of this case may require or as may be just, equitable and proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this complaint so triable.

Dated:   August 11, 2011                          Respectfully submitted,

                                    LOVELL STEWART HALEBIAN
                                    JACOBSON  LLP

                                    By:_____
                                    Christopher Lovell (CL-2595)
                                    Fred Isquith Jr. (FI-1064)
                                    Craig M. Essenmacher
                                     Keith Essenmacher
                                    61 Broadway, Suite 501
                                    New York, NY 10006
                                    Tel. (212) 608-1900
                                    Fax  (212) 719-4775
                                    clovell@lshllp.com
                                    fisquith@lshllp.com


                                    Douglas G. Thompson
                                    Michael G. McLellan
                                    FINKELSTEIN THOMPSON LLP
                                    1050 30th St. NW
                                    Washington, DC 20007
                                    Phone: 202-337-8000
                                    Fax: 202-337-8090
                                    dthompson@finkelsteinthompson.com
                                    mmclellan@finkelsteinthompson.com